## CITY OF TYLER v. ROWLAND. (No. 2419.)

Court of Civil Appeals of Texas. Texarkana. July 8, 1927.

Rehearing Denied Sept. 8, 1927.

1. **Taxation**  &#9756;493(4)—**Where boards of equalization have not exceeded authority or violated law, courts cannot review their decisions merely to correct errors of judgment.**

Courts have no appellate power to review decisions of boards of equalization merely to correct errors of judgment in fixing values, but have power of review only when such boards transcend their authority or violate some legal or constitutional provision to taxpayer's injury.

2. **Taxation**  &#9756;493(7)—**Taxpayer, contesting decision of board of equalization, has burden of showing board exceeded its authority.**

Taxpayer, contesting valuation fixed by board of equalization, has burden of showing more than a mere error in judgment and that the board exceeded its authority or violated some legal or constitutional provision.

3. **Taxation**  &#9756;319(2)—**Though board of equalization heard only testimony of rental value when appraising property, it was assumed they had additional information, gained from general observation of property.**

Though board of equalization heard only testimony of rental value when appraising property, it was assumed that they had additional information which any resident citizen might have obtained from general observation of the property and its surroundings, so that it did not necessarily follow that the rental value was the only consideration in assessing the value of the property for taxation.

4. **Taxation**  &#9756;490—**Decisions of board of equalization are quasi judicial, though it is not a court.**

The board of equalization is not a court, although its decisions are quasi judicial.

5. **Taxation**  &#9756;480—**Proceedings of boards of equalization may be informal and somewhat summary.**

Proceedings before boards of equalization, in view of the character of the service for which they are created and the limitations of time, may be informal and somewhat summary.

6. **Taxation**  &#9756;480—**Boards of equalization are not limited to procedural rules of courts of law in absence of statute or ordinance.**

In the absence of a statute or ordinance prescribing a particular mode of procedure for boards of equalization, they are not limited to avenues of judicial information to which the courts of law are confined.

7. **Taxation**  &#9756;348—**Giving great weight to rental value of property in taxation assessment held not to necessarily lead to erroneous valuation.**

Giving great weight to normal rental value of rental property in evaluating the property

for taxation *held* not to necessarily lead to an erroneous or unfair valuation.

**8. Taxation ⬦⟝348—Taking income from real property as factor in ascertaining market value in assessing for taxation held not tantamount to tax on income.**

Taking the normal income of rental property as a factor in ascertaining its actual or market value when evaluating the property for taxation is not tantamount to a tax on income from the property.

**9. Taxation ⬦⟝460—Unless inequality or discrimination necessarily results from adoption of scheme for evaluating property for taxation, board of equalization will not be held to have exceeded powers.**

Before holding that a board of equalization has transcended its powers by the adoption of an improper scheme of fixing values for taxation purposes, it must appear that inequality or discrimination will necessarily result from the use of such a scheme.

**10. Taxation ⬦⟝611(6)—Where value of property fixed by board of equalization was supported by evidence, it was error for trial court to enjoin collection of tax based on such valuation, notwithstanding court found board's valuation was too high.**

Where the value fixed by the board of equalization on certain property was supported by evidence, it was error for the trial court to enjoin the collection of a tax based on such valuation, notwithstanding trial court found on conflicting testimony that the board's valuation was too high.

Appeal from District Court, Smith County; J. R. Warren, Judge.

Injunction by Meta Rowland against City of Tyler. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Troy Smith, of Tyler, for appellant.
Bulloch & Ramey, of Tyler, for appellee.

HODGES, J. On January 1, 1926, the appellee, Miss Meta Rowland, owned a lot on the north side of the public square in the city of Tyler. On the lot was a two-story building, which was occupied and used for business purposes. Appellee had owned the property for several years, and had rented it to tenants under a contract providing for a monthly rental of $300. In 1926 she rendered the property for taxation to the city at a valuation of $14,600. That valuation was considered too low by the city board of equalization, and, after a hearing, it was raised to $23,400. The tax rate levied and collected by the city that year was $2.50 upon $100 valuation of property. Under the valuation placed upon the property by Miss Rowland in her rendition to the assessor, her taxes amounted to $365.50. Under the valuation made by the board her taxes amounted to $585, a difference of $219.50. In October, 1926, the appellee filed in the district court of

Smith county this suit to enjoin the city and its officials from collecting taxes in excess of $365.50, the amount due upon the basis of the original rendition. She alleged that the city had been and was then accepting property for taxation upon the basis of 65 per cent. of its market value, and that she had rendered her property to the assessor upon that basis; that the valuation placed by her in such rendition was equal to that of other property rendered for taxation in the city, and was 65 per cent. of its true and actual value at that time. She charged that the board of equalization had arbitrarily and capriciously increased the assessed value of her property to $23,400. She also alleged that the raise was made in pursuance of a definite plan of assessment according to which the board ascertained the gross rental returns and revenues from her property for the year 1926; that sum was treated as equal to 10 per cent. of the value of the property; that "thereupon such property was caused to be assessed on a valuation equaling 65 per cent. of the total value of such property as thereby determined; that, in accordance with such method, a valuation of plaintiff's property was fixed by said board in the amount heretofore noted, and such was the sole basis and the only criterion considered by such body in determining such valuation—all of which was over the protest and objection of the plaintiff." She tendered, as full payment of her taxes, the sum of $365.50. In her prayer for relief she asked for a writ of injunction restraining the city and its officials from instituting any suit to collect additional taxes or from making any levy, or foreclosing any apparent lien upon her property to enforce the payment of additional taxes, and from adding any penalties, interests, or costs to any taxes assessed, and for the removal of any cloud upon her title by reason of the excessive taxes claimed.

The case was submitted to the court, who, after hearing the evidence, rendered a judgment granting the relief prayed for. At the request of the appellant he filed findings of fact and conclusions of law, from which we quote such as may be material in considering the questions presented in this appeal. He found, in substance, that the valuation placed by the appellee upon her property in her rendition to the assessor was in the same proportion and amount as other property of similar character then being rendered for taxation by the owners, and upon the same basis which that and other property had been rendered and accepted for the preceding three years. Beginning with the year 1923, the city of Tyler adopted a fixed rule of requiring all taxable property within the city to be assessed at a valuation of 65 per cent. of its market value. In May, 1926, the board of equalization of the city determined to in-

crease the valuation of the appellee's property from $14,600 as rendered by her to the sum of $23,400. The court further found:

"That the said board of equalization determined upon a fixed plan or course of procedure for arriving at and fixing valuations for the purpose of taxation for the year 1926 upon all rental business property in the city of Tyler, Tex., in the following manner: The amount of monthly rental which such property was bringing in the month of January, 1926, was ascertained, and such amount was multiplied by 12 for the purpose of estimating the gross annual revenues of said property for the year 1926. Such sum was then estimated to represent 10 per cent. of the actual value of such property, which was thus calculated to be ten times the amount of the estimated annual revenues. Thereupon the valuation of such property for taxation purposes was fixed at 65 per cent. of such estimated total valuation.

"I find that the valuation placed upon plaintiff's property for taxation by the city of Tyler for the year 1926 was arrived at and determined in accordance with the foregoing plan or scheme, and that such plan was the controlling factor which governed the action of the board of equalization in increasing the evaluation of plaintiff's property from the sum of $14,600 to the sum of $23,400. * * *

"I find that the aforesaid scheme or method of valuing property for the purpose of taxation, which was adopted by the board of equalization of the city of Tyler for the year 1926, was applied, with one or two unimportant exceptions, to all property situated in the business district of said city which was leased or rented by the owners thereof to their tenants; but I further find that such method or system was not applied or resorted to by the board of equalization in fixing the valuation upon any other class or character of taxable property in the city of Tyler for the year 1926, all of which was assessed according to its value. * * *

"I find that the valuation placed upon plaintiff's property by the board of equalization for the year 1926 was excessive and not in proportion to that which other property of similar kind and character and similarly situated in the city of Tyler was being valued by said board of equalization for taxes for the year 1926.

"I further find, however, that the members of the board of equalization were not prompted by any fraudulent purpose or intent to injure or to discriminate against plaintiff in increasing the valuation of plaintiff's property, but that they were governed by their purpose to fix valuations in accordance with the gross rental revenues derived from such property, pursuant to a definite fixed scheme as above outlined."

In response to a request by counsel for appellant, the court further found:

"That the cash market value of the property in question was on January 1, 1926, $27,500; that by the method adopted by the board of equalization the value was placed at $36,000 and then assessed by the board at $23,000, which is 65 per cent. of the value of $36,000; that the overvaluation of said property is not alone sufficient to show fraud on part of the board of equalization in its action."

The correctness of the judgment is challenged upon the ground that it is unsupported by the evidence. The testimony, it is claimed, did not justify the conclusion that the board of equalization confined itself to the consideration of rental value in ascertaining the market value of appellee's property.

The appellee introduced in evidence a city ordinance relating to the appointment of boards of equalization and prescribing their duties. The ordinance required the city council, at its first meeting each year, to appoint as a board of equalization three qualified voters who were resident property owners in the city. Those were to meet annually and perform the duties usually required of boards of equalization. At the first meeting they were to receive the rolls of the assessor for inspection and correction. At a later meeting they were to hear complaints from those whose assessments had been changed. Their decisions were to be final.

The record shows that three men—Hicks, Williams, and Bailey—composed the board of equalization. They were all property owners and residents of the city. Two of them had served in a similar capacity in former years. All of them testified in the trial below. Their testimony related mainly to what took place at their second meeting held to hear complaints against increased valuations.

Hicks, the chairman of the board, testified that Swann, the agent of appellee, appeared, and his attention was called to the fact that Miss Rowland's property was assessed at too low a valuation. The board ascertained from Swann that the property was rented to tenants at $300 per month. Hicks further testified:

"I am acquainted with the cash market value of property in the city of Tyler, January 1, 1926. $23,400 was 65 per cent. of the cash market value of Miss Meta Rowland's property on January 1st. In my opinion that is a fair 65 per cent. of the cash market value January 1, 1926. Her building is wider than the other buildings in that block, and longer. * * * I don't know what the physical condition of that building was on January 1, 1926. The building was always rented. It was occupied. It is a two-story building. I don't know whether both stories were occupied or not. As a member of the board of equalization, I strove to get at an equitable value of the property. I think we did. I would say the other buildings along the north side of the square are of different values. We fixed them at different values for taxation purposes. * * * I didn't fix them at the same value, because I didn't think that their value was the same, and I formed my opinion from the location and how the buildings rented, the revenue that the owners derived from the buildings, with the idea and knowledge that, if a person had a building that rented for $300, a month that that building was worth $300 and, if the person next door had a building that rented for $250 a month, that building was only worth $250 a month, and, if a party across the square

had a building that only rented for $100 a month, that that was all that building was worth, for the reason they got all they could out of the buildings and the buildings were always occupied."

On cross-examination, he admitted that the board had considered the rental value of property in fixing its actual value. He continued:

"Before we fixed the assessed valuation on any of the business property around town this year, we didn't necessarily first ascertain the amount of rent that the particular piece of property was bringing. We considered where the property was and what it was. Instead of first, it was last that we ascertained the rent. Before we reached any exact definite figure we found out what the rent was. We got all the information we could, and the rent was part of the consideration. When we finally came down to calculating the assessed valuation, we did not let the rents control the figures entirely, but we did in practically every instance as far as business property was concerned. We did in Miss Meta Rowland's instance. In other words, we made out her annual rent at $3,600 for the year 1926. We got that estimate on the basis of what she was getting for the month of January. Of course we didn't know then whether the building would be rented all of 1926 or not, but we estimated it would be. When we got that $3,600 estimated annual rental, we fixed that as 10 per cent. We determined that would represent 10 per cent. instead of 8 or 12 per cent. because my experience has been that brick buildings would sell for ten times the gross rentals. If you had a piece of property bringing you $2,400 a year, you could sell it most any time for $24,000. Rents do vary. Rents are a matter of contract between individuals."

Again the witness said:

"When Miss Rowland and Mr. Swann came down before the equalization board to see about this matter, we told them we wanted to know what the rent was, and that we were fixing the assessed valuation on that basis, and didn't want to hear and consider anything else, because we had figured that was the value of property. I didn't tell practically all the other owners of business property around the square when they came down that that was the only thing we wanted to know, what rent they were getting. You are going too strong. We told them we had decided that the way to get at the value was from looking them over and figuring, so we would like to know what the rents on the buildings were, and we were taking that as 10 per cent. of the gross value and then putting it at 65 cents on the dollar. We told them that that was the way we were figuring it. That is practically what we told them; practically what we did. Some buildings on the north side of the square we reduced from the amount that they were rendered for on that account."

On redirect examination, the witness said:

"I think we called all of the owners of business property around the city. I think that was the idea. I don't think we changed them all. I arrived at the value of property in a general way from what property was selling at.

Wherever a piece of property would sell in a place that would have something to do with getting a general idea of the values, and, after getting that, then I found that the rental proposition was pretty fair—in other words, was treating everybody pretty fair."

The witness then referred to another piece of property in that vicinity in which they disregarded the rental value because they thought special conditions had caused it to rent at a sum beyond its worth.

F. E. Williams, another member of the board, testified as follows:

"We took into consideration the location and condition and the rent obtained from buildings in fixing a value for taxation. The taxable value was based on 65 per cent. of the cash market value. According to my judgment, the value fixed on Miss Meta Rowland's building was a fair valuation based on the 65 per cent. I think it was in line with other property of the same kind and character in the city of Tyler January 1, 1926. We had no other purpose than to try to equalize. * * * We placed different values on different properties located on the north side of the square. We did that mostly on a rental basis. We had another reason for fixing different values. It was owing to the condition of the property and its location. Our purpose in fixing the value of $23,400 on Miss Rowland's property was to get the fair valuation."

He said, on cross-examination:

"We assessed Miss Rowland's property at the value of $23,400. We arrived at those figures by taking the rental value per month and multiplying that by 12 and let that represent 10 per cent. of the gross value, and then took 65 per cent. of that for the assessed valuation. There were some exceptions, but that was the general rule we used in arriving at the assessed valuation of the rental business property. Even though we might have discussed the location and condition of the property, in Miss Rowland's case the controlling factor was the revenue. We didn't arrive at the assessment at $23,400 upon that alone. That was the way we arrived at it. That was the controlling factor. * * * That method or scheme of assessing property was not applied to any other property in the city of Tyler except business rental property; that is, it wasn't applied to residence property or residence rental property or to personal property."

On redirect examination he said:

"There were some exceptions made in business property. If I could go to the record, I could tell you of them. I just remember a few. * * * We didn't follow that rule with reference to those properties because we didn't think it was fair and equitable to take the rents as the basis only. If we calculated the rents and it produced a value which was in the opinion of the board in excess of the actual cash market value, in some instances we reduced it. In all instances I would have reduced it had I thought it was that way."

J. L. Bailey, another member of the board, testified:

"In fixing the values that we fixed for Miss Rowland's property and other property similarly located, we took as a basis the rent that the property was bringing to arrive at the value of the property. We found that the value of the property, where it was bringing the price, it looked like it was worth the money, and that the value would be put on by that rendition. I don't know that we found any property that in the opinion of the board did not reflect the value by the rent. * * * I am not acquainted with the cash market value of the property around the square here on January 1, 1926. I am not acquainted with the value of the property except as I stated the rental basis. In my opinion, as a member of the board of equalization, the value that we placed on Miss Meta Rowland's property over there was on the same basis with other property on the north side of the square. * * * The way we calculated our assessments was on the basis of the rents for the year 1926. All we inquired into was what revenue it was bringing and then on that basis we calculated the assessed valuation. If it was bringing the rent, it was worth the money. At least that is the way I figured it. That is the way I figure anything I go at. If I get that for it, it is worth the money, whatever revenue I am getting on it. I do not own any business property. We didn't tax anything on the rental basis except business property. If business property is worth what it will bring, other property is also worth what it will bring, but we didn't apply that system to other property."

In answer to an interrogatory propounded by the court, witness said:

"We were trying to ascertain the fair valuation of the property. The plan we adopted was to assess for tax purposes 65 per cent. of its actual value. Our idea was that a good way or just way or fair way to determine the value was what the property was bringing, and we made that the basis of determining the value."

S. A. Shelton, city assessor, was called by the plaintiff. After testifying to the first meeting of the board and what was done with reference to raising assessments, he said:

"At that time the board spoke of that plan (rental value) of assessing business property. I don't know as it was determined at that time, however. I couldn't say when it was determined that that plan would be pursued. It was suggested but not finally adopted at the first meeting that the system of assessing business rental property for taxation in 1926 would be upon the basis of the rents estimated to be obtained. They didn't say at the first meeting that they were going to adopt that plan. It was finally adopted prior to the time Mr. Swann and the other owners of business property were called before the board. And that plan was pursued. I don't know as it was stated to Mr. Swann that that was the plan which was adopted and that plan on the basis of rental revenues would be the determining factor in fixing those values for assessment purposes, but it was used to help determine the values. They were taking the rents to help determine the values. Mr. Hicks told Mr. Swann when he appeared before the board that was the plan they were adopting. I said that some discus-sion was had as to some features of the values of those buildings. I don't know that all the other features were disregarded absolutely in fixing valuations. They used the rents as a help to determine the value of Miss Rowland's property."

The findings of the trial court in this case have removed any ground of complaint of an intentional discrimination against the appellee, or of an appraisement in excess of the true, or market value of her property. He expressly finds that the lot and its improvements were worth $4,100 more than the assessed value fixed by the board of equalization for taxation. He concluded, however, that the valuation was discriminatory as a result of a plan or scheme adopted by the board in taking the rental value of property on the first day of the year as the sole and exclusive evidence of its market value.

[1, 2] Courts have no appellate power to review the decisions of boards of equalization merely to correct errors of judgment in fixing values. It is only when such boards transcend their authority, or violate some legal or constitutional provision, to the injury of a taxpayer, that court of equity may set aside their decisions. Druesdow v. Baker (Tex. Com. App.) 229 S. W. 493; Johnson v. Holland, 17 Tex. Civ. App. 210, 43 S. W. 71; Iron v. Wakefield, 247 U. S. 350, 38 S. Ct. 495, 62 L. Ed. 1154; Lacy v. McCafferty (C. C. A.) 215 F. 352; Cooley on Taxation (2d Ed.) 218. If this were not so the law which makes the decisions of boards of equalization final would be meaningless. It is also true that a taxpayer who applies to a court of equity for relief against the action of a board of equalization has the burden of proving that the board has exceeded its authority, abused its powers, or violated some legal or constitutional provision, to his injury. In discharging that burden, he must do more than show merely an error of judgment by the board in valuing his property. Iron v. Wakefield, supra.

Two facts should be kept in mind in a suit of this character. One is that valuing property is a matter of opinion and a subject about which men of equal sincerity, capacity, and opportunity may differ. Another is that absolute uniformity in assessing property values for taxation is a practical impossibility. It follows that, as long as a board of equalization acts within the limits of its authority, proceeds in a lawful manner and with a lawful intent to perform its duties, courts have no right to interfere. In determining the question of interference, some latitude must be allowed boards of equalization as a proper range of differing opinions on issues of value, before assuming that they have acted arbitrarily. There are some expressions used by the witnesses in the trial below which convey the impression that in estimating the market value of business rental prop-

erty around the public square in the city of Tyler the board adopted the plan of considering only its rental value. But when the testimony is considered in its entirety, the fair inference is that the witnesses meant that the board inquired into and considered the rental value "as a help" in arriving at the true or market value. Any other conclusion would involve a disregard of the qualifying and explanatory statements made by those who testified.

[3-6] Counsel of appellee bases his argument in support of the conclusion reached by the trial court upon the fact that no testimony was heard by the board when appraising the property, except that which related solely to the rental value. Conceding that to be true, does it necessarily follow that no other facts were considered or could have been considered? Was the board limited in its search for evidence relating to value to the testimony of witnesses who appeared before it in open session? We think not. The members of the board were resident property owners. They each personally knew the location and character of the property situated around the public square. It is only fair to assume that they also had the information which any resident citizen may gain from a general observation of property and its surroundings. A board of equalization is not a court, although its decisions are quasi judicial. If they were courts, then courts of equity could not, in the absence of some statutory authority, revise their decisions. The character of the service they are created to render and the limited time within which that service must be performed furnish the best of reasons for saying that their proceedings may be informal and somewhat summary. In this case the records show that about 800 property owners had been notified of alterations in their assessments. That presented at least 800 possible controversies which the board had to pass upon and decide within a few weeks, if the collection of taxes was not to be delayed. The possibility of that situation, and of those requiring even much more time and labor, clearly indicate that boards of equalization are not limited to the avenues of judicial information to which courts of law are confined. The case of Brunderet v. Lucas (Tex. Civ. App.) 194 S. W. 613, is referred to. That case was decided by the Court of Civil Appeals at San Antonio, and a writ of error was refused by the Committee of Judges in November, 1917. It is sufficient to say that

the ruling in that case was expressly based upon the particular provisions of the statute then in force, regulating the proceedings of county boards of equalization. It is intimated in the opinion that a different conclusion would have been reached if the statute had not been so amended as to provide a particular mode of procedure. There is no statute or ordinance of the city which prescribed any particular mode of procedure for the board in this instance.

We do not think the record in this case warranted the conclusion of the trial court that the board of equalization adopted the plan or scheme of considering only the rental value of property in arriving at its market value. The finding of the trial judge implies that all other evidence of value was either ignored or excluded from consideration.

[7, 8] The evidence does warrant the conclusion that the board gave great weight to rental value, perhaps more weight than was given to any other single factor appropriate to be considered in ascertaining market value. But we do not think that giving great weight to the normal rental value of rental property, such as that here involved, necessarily leads to an erroneous or unfair valuation. Rent is income; but, taking the actual normal income of real property as a factor in ascertaining its actual, or market value is not tantamount to a tax on income from the property. It is a matter of common observation that the market value of business property is largely controlled by the income it will yield upon the investment.

[9, 10] Before holding that a board of equalization has transcended its powers by the adoption of an improper scheme or standard of ascertaining and fixing values, it must appear that inequality or discrimination is the necessary result of such a scheme or standard. M., K. & T. Ry. Co. v. Shannon, 100 Tex. 379, 100 S. W. 138, 10 L. R. A. (N. S.) 6; Cummings v. Merchants' Nat. Bank, 101 U. S. 153, 25 L. Ed. 903. That does not appear in this instance. It is true the court found that the market value fixed by the board was too high. But he based that finding upon conflicting testimony. When the record is examined, it will be found that there is as much evidence to sustain the value fixed by the board as there is to sustain the value fixed by the court.

The judgment of the trial court will be reversed, and judgment here rendered denying the injunction prayed for.